242 A.2d 407.

SIDNEY DAWSON *vs.* RHODE ISLAND AUDITORIUM, INC.

JUNE 3, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. This is a negligence action which was tried before a superior court jury and resulted in a verdict for the defendant. Thereafter the trial justice granted the plaintiff's motion for a new trial. The case is before us on the defendant's appeal from the superior court's dismissal of its motion for a directed verdict and its granting of the plaintiff's motion for a new trial.

The defendant owns in the city of Providence the Rhode Island Auditorium, Inc. which it operates as a place for the public use and entertainment.

The plaintiff was a professional basketball player who toured the country as a performer with the Harlem Magicians, a team known as much for their farcical antics on a basketball court as they are for their skill as players of the game. On March 12, 1962, the Harlem Magicians appeared at the auditorium to exhibit their comical basketball rou-

tine. As part of their usual pre-game warm up, the Harlem Magicians would assemble in a circle near the middle of the court and commence a display of unusual dexterity and wizardry in the art of ball handling and passing. At the completion of this facet of their performance on that evening, plaintiff was to leave the "magic circle," as it is so billed, dash toward the basket, receive a soft "lead" pass from a teammate and thereafter was to utilize his 6′ 8″ 250-pound frame to good advantage by propelling himself through the air and at the height of his leap, "dunk" the basketball through the "hoop." In the parlance of the basketball world, a player has performed a "dunk shot" when he successfully lifts the ball to a level of height above the basket and thereafter forcefully hurls the ball down through the basket in a missile-like fashion with vigor and strength. This difficult ritual, when executed with grace and style, invariably evokes spontaneous responses of excitement and appreciation from those spectators familiar with the sport.

In accordance with this rehearsed procedure, plaintiff broke from the huddled circle of teammates, proceeded with increasing speed toward the basket but, just as he was about to receive the expected pass from one of his teammates, he slipped on "something slick" and fell with a hard bang hitting his left knee, twisting his back, and striking his head on the wooden floor of the basketball court. Aside from the crashing ignominy he doubtlessly suffered from this mishap, plaintiff sustained serious injuries which he claims have prematurely caused him to terminate his activities as a professional athlete.

Testimony elicited at the trial indicates that what caused plaintiff's unexpected tumble was a puddle of water which plaintiff claims had accumulated on the floor as a result of a leaky roof over the playing court. Additional evidence was introduced through the testimony of a local meteorologist from the United States weather bureau for the Provi-

dence area. He told the court that on March 12, 1962, Rhode Island was under siege of a "northeaster" with all the hard driving rain and high winds which normally accompany such storms. Meteorological records indicated that 1.61 inches of rain mixed with some snow and sleet descended on the state during the course of the day and evening in question. This storm began at 6:25 in the morning and continued in varying intensity until after midnight.

The plaintiff's complaint[1] contains four counts each of which fashions a different theory of recovery but all of which sound in negligence. The varied allegations contained in these counts may be summarized as follows: defendant failed to furnish a reasonably safe surface on which plaintiff could properly perform his duties as a basketball player because, first, defendant allowed water to accumulate on the floor; second, defendant permitted such water to remain on the floor; third, defendant failed to warn plaintiff of the hazardous conditions of the playing surface caused by the presence of water thereon; and fourth, defendant maintained a roof over the playing court which, because of its state of disrepair, was prone to leak and cause water to accumulate on the floor, which accumulation resulted in treacherous underfooting. The plaintiff also alleged that defendant had actual or constructive notice of these conditions.

Under the posture of this appeal, defendant asks us to rule on two points; first, the trial justice's denial of its directed verdict and second, the trial justice's granting plaintiff's motion for a new trial. We shall review them seriatim.

---

[1]Although plaintiff initiated this litigation by filing a writ and declaration in 1963, the trial was held after the adoption of the new rules of civil procedure for the superior court. In conformance with our pronouncement in *Buszta* v. *Souther,* 102 R. I. 609, 232 A.2d 396, we have in this opinion employed the vocabulary of the new rules where appropriate.

## Denial of Directed Verdict

At the conclusion of plaintiff's case, defendant without resting moved for a directed verdict which motion the trial justice denied. Thereupon, defendant opened its case and at the completion of all the evidence, defendant renewed its motion for a directed verdict which motion was again denied. It is the second motion for a directed verdict with which we are concerned on this appeal as defendant is deemed to have waived its rights to seek review for the denial of the first motion once evidence was introduced on its behalf. See rule 50 of the rules of civil procedure for the superior court and reporter's notes thereon.

In considering a motion for a directed verdict, the trial justice has a clearly defined duty. He must view all the evidence in the light most favorable to the party moved against and is obliged to give the non-movant the benefit of all reasonable and legitimate inferences which may properly be drawn therefrom, without, of course, sifting or weighing the evidence or exercising his independent judgment as to the credibility of those witnesses who have testified before him. *Nicholson* v. *Narragansett Tastee-Freez Co.*, 101 R. I. 323, 222 A.2d 776; *Gaudette* v. *Carter*, 100 R. I. 259, 214 A.2d 197; *Marsh* v. *Bliss Realty, Inc.*, 97 R. I. 27, 195 A.2d 331. If, after taking such a view, the trial justice finds that there exists issues upon which reasonable men might draw conflicting conclusions, the motion for the directed verdict should be denied and the issues should be left for the jury to determine. *Morrarty* v. *Reali*, 100 R. I. 689, 219 A.2d 404; 5 *Moore's Federal Practice* (2d ed.), ¶50.02 [1], p. 2320.

In reviewing the trial justice's decision on a motion for a directed verdict the supreme court reviews all the evidence in the same manner and fashion as is expected of the trial justice and is bound by the same rules as those which govern him. *Hill* v. *A. L. A. Construction Co.*, 99 R. I. 228,

206 A.2d 642; *Priestly* v. *First Nat'l Stores, Inc.,* 95 R. I. 212, 186 A.2d 334.

In conformance with the above-mentioned rules, we have reviewed all the evidence which was before the trial justice at the completion of the case and we are of the opinion that he correctly denied defendant's motion for a directed verdict. In our judgment, the evidence in the record, considered in a complexion most advantageous to plaintiff, indicates that there existed several controvertible issues of fact which warranted their being sent to the jury for determination. For instance, the evidence in this case raised the issue of whether or not, on the facts testified to at the trial, defendant could be charged with the notice of either the leaks in its roof or the water later discovered on the floor; furthermore, if defendant was deemed to have had notice of these conditions, there existed the issue of whether or not it had taken such reasonable steps in the exercise of due care to assure plaintiff of a reasonably safe place on which he could exhibit his basketball skills. As to the issues of notice and due care, each side took a position contrary to the other, and each party introduced evidence in support of its position. Under such circumstances it would have been inappropriate for the trial justice to have granted the motion for a directed verdict. Accordingly, therefore, we affirm his decision denying defendant's motion.

## Granting of a New Trial

On a motion for a new trial, the trial justice has a clearly defined duty under our law. He must utilize his superior judgment by independently reviewing all of the material evidence, passing upon the weight thereof, and determining the amount of credibility which he believes should be attached to the witnesses who appear before him. In carrying out this important function, the trial justice is permitted to reject some evidence or testimony, either because it was impeached, or contradicted, or because other circum-

stances render it inherently improbable; he may also draw inferences which are reasonable in view of the testimony and evidence which are in the record. *Barbato* v. *Epstein,* 97 R. I. 191, 196 A.2d 836. Upon scrutinizing all the evidence in the fashion and manner outlined in *Barbato,* the trial justice must then relate in his ultimate decision those portions of the evidence which he rejects, those principal witnesses who in his opinion are worthy of belief or disbelief, those inferences and conclusions he has drawn and the reasons which influence his determination. *Israeloff* v. *Whitehall Taxicab Co.,* 96 R. I. 231, 190 A.2d 588.

After conforming with the above requirements, the trial justice must elect one of two paths to follow; first, in those instances in which his judgment tells him that the evidence is so evenly balanced that reasonable men could arrive at different results in the consideration of the case, he is obliged to deny the motion and to affirm the verdict. *Waltz* v. *Aycrigg,* 103 R. I. 109, 235 A.2d 338. On the other hand, in those instances when the trial justice is satisfied that the verdict is contrary to the fair preponderance of the evidence and thereby fails either to respond to the merits of the controversy or to bring substantial justice to the parties, the motion must be sustained and the verdict set aside. *New England Window Co.* v. *Bacon,* 98 R. I. 443, 204 A.2d 433.

On appeal from an adverse ruling on a motion for a new trial in cases where the trial justice properly performs his function as outlined in *Barbato,* the appellant must persuade this court that the trial justice in deciding the motion was clearly wrong or overlooked or misconceived material evidence on a controlling issue in the case. *Labbe* v. *Hill Bros., Inc.,* 97 R. I. 269, 197 A.2d 305.

In the instant case the trial justice has distinctly complied with the requirements asked of him in considering plaintiff's motion. Having done so, the only question remaining for us to determine is whether or not he was clearly

wrong in granting plaintiff's motion. A proper resolution of this question requires us to examine some of the evidence and to comment briefly on the reasons which the trial justice gave for his decision.

The prime contention of defendant in this aspect of the case is that the trial justice was clearly wrong in setting aside the jury's verdict because in its opinion he merely substituted his conclusion for that of the jury's. The defendant insists that the evidence presented at the trial in this case raised a very close question as to whether or not it was negligent. It contends that when a trial justice, after having independently reviewed the record and properly performed his function in regards thereto, is presented with a case in which the evidence is nearly balanced on the issue of negligence, he is without authority to grant a new trial. While we agree with the principle of law advanced by defendant, we cannot accept its characterization of the record.

The defendant takes the position that it was free of fault in plaintiff's accident, was at all times in the exercise of due care and, therefore, never breached any duty it owed to plaintiff. Moreover, defendant vigorously asserts that under the facts of this case, it could not be found that it had adequate notice of either the alleged leak in the roof or the existence of water on the basketball floor to warrant a determination that it had breached the duty of care it owed plaintiff.

Both parties identify plaintiff as a business invitee of defendant. It is well-established law in this jurisdiction that a landowner owes to a business invitee a duty to use reasonable care to keep his premises in a safe condition for the purposes of the invitation; that an owner is not an insurer of the invitee's safety; that, in order to recover for injuries sustained on the owner's premises, the invitee must allege and prove some specific act of commission or omission by the owner which amounts in the law to a breach of

duty owed to him; that the breach of duty was the proximate cause of the injury sustained; and, additionally, the invitee must demonstrate his own freedom from conduct which could be classified in the law as contributory negligence. *McVeigh* v. *McCullough,* 96 R. I. 412, 192 A.2d 437; *Lapierre* v. *Greenwood,* 85 R. I. 484, 133 A.2d 126; *Langley* v. *F. W. Woolworth Co.,* 47 R. I. 165, 131 A. 194. Furthermore, we have previously held that the mere establishment of a fall sustained by a business invitee as a result of a slippery floor is not in and of itself evidence of negligence on the part of a landowner. *Faubert* v. *Shartenberg's, Inc.,* 59 R. I. 278, 195 A. 218.

In the present case plaintiff introduced evidence to establish that he slipped and fell on defendant's basketball floor; that a puddle of water, which was subsequently discovered on the floor, caused his fall; that he sustained serious injury as a consequence of the fall; that defendant's roof contained scores of leaks in 1959; and that this leaky condition existed right through the day on which plaintiff was injured. Contributory negligence is not an issue in the instant appeal.

The defense thereafter introduced evidence to show that it acted with due care for plaintiff's safety; that it never had actual or constructive notice of the water later found to be on the floor or for that matter of the porous condition of its roof on March 12; and finally that it had taken all reasonable steps which a prudent auditorium owner would take under the circumstances of this case, to wit, having the roof repaired and resurfaced in prior years when leaks were first discovered and having the floor examined by its employees on the evening in question prior to the game.

After reviewing the evidence in some detail we feel that defendant's appeal gives rise to one issue which is the very keystone on which the decision of the trial justice in grant-

ing the new trial rests. The issue to which we refer is that of notice. The trial justice in his analysis of the facts found that defendant was on notice of both the leaks in its roof and the water on its floor. As may be expected, the position of defendant on this issue is diametrically opposed to that of the trial court. Hence, their differences leave a prime issue to be resolved by us which may be phrased as follows: whether or not the trial justice was clearly wrong in finding that defendant knew or, in the exercise of due care, should have known of either the roof's propensity to leak in wet weather or of the existence of water on the playing surface of the basketball floor on the evening of plaintiff's injury. Our review of the evidence leads us to conclude that the record supports the trial justice's finding.

The part of defendant's roof which overhangs the auditorium's basketball court and the tiers of seats which encircle the court contain approximately 53,000 square feet. The roof is peaked and consists of overlapping cement slabs over which a tar-like substance designed to make the roof impenetrable had been applied. Testimony during the trial referred to this part of defendant's premises as the "gabled" portion of the roof. It is clear from the record that the gable roof was leaking badly in the fall of 1959 when defendant engaged the services of a roofing repair company. At that time it was estimated that the roof had approximately 387 leaks. The roofing contractor offered to do the job for a contract price of $18,130. The defendant, however, due to its desire to have an opportunity whereby its employees could check on the quality of the work being done and because of the possibility it could save money on the contract price, decided to have the work done on a cost-plus basis. It is conceded that the roofing contractor would give no assurance that its work would cure the roof of all its leaks. It was agreed, however, that if the auditorium employees would inspect the roof on wet days, identify as

best they could the location of leaks which might have survived the prior resurfacing, the repair company would return and attempt to seal the discovered leaks. It was pointed out that the emulsion which was to cover the cement slabs was of such a viscosity that it could only be properly applied during certain times of the year when the outdoor temperature was neither too cold nor too hot. Evidence in the transcript shows that while the first coats had been applied to the roof during 1960 and 1961, supplemental roof repairs continued to be made up through mid 1962. At the trial, it was learned that a few days after March 12, 1962, the date of plaintiff's fall, an examination of the gabled roof revealed that it still contained approximately 30 leaks.

Having familiarized ourselves with the transcript in this case, we are of the opinion that defendant should be said to have been on notice of the leaks in its roof from late 1959 through the day of plaintiff's injury. There was evidence introduced at the trial of the continuing existence of leaks in defendant's roof and of repeated resurfacing endeavors which were attempted in order to seal those crevices through which outside precipitation was still passing. Having in mind the chronic leaking condition of its roof, we believe it is not unreasonable to conclude from the instant record that defendant knew or, in the exercise of prudence, should have known that on days or nights on which there occurred heavy precipitation, its roof would permit moisture to penetrate the building. March 12, 1962 was surely a day on which a significant amount of precipitation descended in and about the general vicinity of the auditorium. It is our opinion therefore that on that day defendant could reasonably expect that its roof would leak.

As to the trial justice's conclusion that defendant was on notice of the water on its floor, we are also in agreement. The testimony in the transcript justifies the inference of constructive notice drawn by the trial justice. Specifically,

we refer to the remarks made by Jess L. Garrett, the basketball referee, who travels with the Harlem Magicians. He testified that he observed "puddles" of water on defendant's floor on the evening of March 12, a few moments after plaintiff had fallen; he also stated that he had rushed to plaintiff's aid immediately after witnessing him slip and that, as he attempted to assist plaintiff to his feet, he noticed the floor was wet in spots; he further indicated that he discerned a puddle of water which had a circumference of about three feet and which was located precisely where plaintiff fell. On cross-examination, Garrett further told the jury that he had observed water falling from the roof as the evening progressed. Because of the actual notice of the fact that its roof leaked in wet weather and considering the size and extent of the water which had accumulated on the basketball floor, we concur in the trial justice's finding that defendant knew or should have known of the presence of water on the floor that night.

In its argument defendant also contends that since there is nothing in the record which shows that on prior occasions the auditorium roof had leaked in the very area over which plaintiff slipped and fell, it cannot be said to have been on notice of this particular leak or the water which had entered the building via this same leak. This argument is unpersuasive to us. It seems clearly established that defendant was on notice that its roof was still leaking on March 12, 1962. While it is true that defendant may not have had knowledge of the exact location of each leak in its roof, it cannot be seriously maintained that this fact should relieve it from liability. Once defendant is said to have had notice of the leaky condition of its roof, there arose a duty on its part which could only have been discharged by it in one of two ways—it had either to arrange for a watertight roof or alternatively it had to advise invitees of the conditions of the premises and the risks which attend these conditions.

We must now decide, in view of defendant's knowledge of the leaks and the puddles formed thereby, whether defendant's conduct comports with the standard of due care required of it in its dealings with plaintiff on March 12. Clearly defendant owed a duty of care which required it to take such measures to provide a reasonably safe place for the purposes of the invitation extended to plaintiff, namely, the playing of basketball. *Cf. McVeigh* v. *McCullough, supra.* It seems to us, therefore, in the light of the foregoing comments, that in order for defendant to exculpate itself from a finding of negligence on its part, it had to show one of two things: first, that having become aware of the leaky roof, it had undertaken such action which would assure a reasonable auditorium owner that all the leaks in its building were corrected—in substance, to make certain that its building was watertight; or secondly, show, as an alternative to eliminating all the leaks, it had apprised plaintiff, before his scheduled performance on the court, of the actual conditions of the building and at the same time issue him a warning of the risk of harm which those conditions presented to anyone choosing to play basketball at defendant's auditorium. See 2 *Restatement,* Torts 2d, §343, comment d, p. 217.

In regards to the first alternative, it seems clear from the record that defendant's officers and employees never had pursued a course of action which would have given them any assurance that the leaks in the roof would be fully repaired. In his testimony, the president of defendant corporation admitted 'that the contractor who agreed to repair the roof refused to guarantee its future water repellency. Indeed, at no time during the trial was there an unequivocal declaration made on behalf of defendant that the roof had ever been so rehabilitated as to make it completely leakproof after 1959.

With regard to defendant's duty then, and in view of our comments in the preceding paragraph, we are concerned

only with the second alternative. It appears very evident from the record that plaintiff was never informed prior to his fall by anyone in the employ of defendant of the leaks in the roof, the water on the floor, or the risk of harm which such conditions created for people playing basketball on defendant's court that night. In our opinion, under the facts of this case, defendant was duty bound both to apprise plaintiff of the conditions of the building as well as to warn him of the dangers which he faced while playing basketball on its court. The defendant's failure to demonstrate by competent evidence that it complied with the exactions of the duty owed to plaintiff rendered it vulnerable to a motion for a new trial setting aside the jury's verdict in its favor.

In addition, we assign no weight to defendant's contentions that the trial justice misconceived or overlooked the testimony of either the supervisor of the basketball program at the auditorium or the superintendent of maintenance. As to the supervisor's statement that the basketball floor was free of moisture up until 8 p.m., the trial justice specifically discounted it because of the witness's failure to remember other events which occurred that evening, such as Dawson's fall, and which the trial justice believed should have been recalled by one professing to recollect what actually took place before the basketball game.

As to the building superintendent's testimony, the trial justice expressly remarked that he found this witness to be creditable. We note, however, that even when his testimony is regarded in a light most favorable to defendant, it would be insufficient to establish the fulfillment of the duty of care owed plaintiff. The fact that the superintendent stated that he last examined the basketball floor at 7 p.m. on March 12 and found it to be dry and safe for the basketball game is of no particular consequence. What is important is whether or not defendant had ever fully waterproofed its roof or in the alternative had warned plaintiff of the risk

which he and his teammates faced by playing basketball at the auditorium that night. Since the superintendent's testimony established neither fact, it is of little assistance to defendant here.

Finally, in regards to those pieces of the evidence to which the defendant's counsel invites our attention as being inconsistent or contrary with the decision of the trial justice, we are likewise unmoved. In response to this portion of counsel's argument, we refer to our rule laid down in *DiMaio* v. *DelSesto,* 102 R. I. 116, 228 A.2d 861, wherein we said that the failure of a trial justice to refer to evidence contradictory to that upon which he relied, does not constitute misconceiving or overlooking material evidence provided that the justice referred to those parts of the evidence on which he did rely and indicated contrary evidence was rejected. An attentive reading of his written decision satisfies us that the trial justice fairly indicated the evidence on which he relied as well as that which he rejected. Accordingly we affirm his decision granting the plaintiff's motion for a new trial.

The defendant's appeal is denied and dismissed, and the case is remitted to the superior court for further proceedings.

Motion for reargument denied.

*Edward I. Friedman, Mary Ellen McCabe,* for plaintiff.

*Keenan, Rice & Dolan, John T. Keenan,* for defendant.