259 A.2d 115.

ROBERT K. PAQUIN *vs.* PROVIDENCE WASHINGTON
INSURANCE COMPANY.

NOVEMBER 17, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. This is a civil action[1] to recover damages

---

[1]This was an action of assumpsit which was instituted before the adoption of the Superior Court Rules of Civil Procedure but tried sometime thereafter.

under the theft provision of an automobile insurance policy issued the plaintiff by the defendant insurer. Trial was held in the Superior Court where a jury returned a verdict for the insurer. Thereafter, the Superior Court denied the plaintiff's motion for a new trial and he filed this appeal.

While plaintiff has alleged in his brief that the trial justice erred in certain portions of his charge to the jury, the record shows that plaintiff offered no objection whatever to the charge. It is well settled that instructions not objected to become the law of the case. See *Petitpas* v. *Merchants Mutual Insurance Co.*, 103 R. I. 479, 238 A.2d 750. Rule 51 of the Superior Court Rules of Civil Procedure specifically provides that "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The sole issue before us, therefore, is whether the Superior Court erred when it denied plaintiff's motion for a new trial. In our opinion, it did not.

The plaintiff resides in Seekonk, Massachusetts. He testified that on June 7, 1965, he came to Johnston, Rhode Island, and purchased a 1964 blue Corvette convertible coupe from a used car dealer located in that town. The next day, on June 8, 1965, defendant through its duly authorized agent sold plaintiff a Massachusetts motor vehicle policy. It is conceded that Paquin paid the agent the required premium. On June 19, 1965, at 6:55 a.m., plaintiff notified the Seekonk police that his Corvette had been stolen. Some 12 hours later, the car was recovered at the end of plaintiff's street a short distance from his home. When discovered, the car was damaged and stripped of many parts including its transmission, intake manifold, radiator and the convertible top. The plaintiff filed a sworn proof of loss with defendant. The defendant refused to make any payment and this suit was begun. Throughout

this litigation, the insurer has maintained that plaintiff had no insurable interest in the Corvette and secondly, that no loss or theft had occurred within the meaning of its policy.

On an appeal from an adverse ruling on a motion for a new trial, where the trial justice has, in accordance with the rule in *Barbato* v. *Epstein,* 97 R. I. 191, 196 A.2d 836, utilized his superior judgment by independently reviewing all the material evidence, passing upon the weight thereof and determining the amount of credibility which he believed should be attached to the witnesses who appeared at the trial, the appellant must persuade this court that the trial justice in deciding the motion was either clearly wrong or overlooked or misconceived material evidence on a controlling issue in the case. *Dawson* v. *Rhode Island Auditorium, Inc.,* 104 R. I. 116, 242 A.2d 407. In pressing his appeal, plaintiff maintains that the evidence is uncontradicted that he owned a 1964 Corvette which was stolen from his driveway sometime between 11:15 p.m. on June 18, 1965 and 6:55 a.m. on June 19, 1965 and that, when found, the automobile was in a damaged and stripped condition. The plaintiff seeks to show that the trial court was clearly wrong and, since the evidence was uncontradicted, he claims that the trial justice, in considering the motion for a new trial, was bound to find that plaintiff was entitled to recover under his policy.

In describing his testimony as uncontradicted, plaintiff has alluded to the well-established rule in this jurisdiction that the trier of facts must accept completely uncontradicted and unimpeached testimony as probative of the fact it was adduced to prove. We first promulgated this rule in *Gorman* v. *Hand Brewing Co.,* 28 R. I. 180, 183, 66 A. 209, 211, and reiterated it many times since. It was pointed out, however, in *Laganiere* v. *Bonte Spinning Co.,* 103 R. I. 191, 236 A.2d 256, that the rule set forth in *Gorman* is not

without exception or qualification. We have said that the trier of fact is not bound to accept the testimony of a witness merely because there is no direct testimony contradicting it where it contains inherent improbabilities or contradictions, which alone or with other circumstances in evidence affect its weight or credibility. *Walsh-Kaiser Co.* v. *Della Morte,* 76 R. I. 325, 69 A.2d 689; *Somerset Realty Co.* v. *Shapiro,* 51 R. I. 417, 155 A. 360. Positive uncontradicted testimony may be impeached on the basis of observations made by the jury or the trial justice of the witness and the manner in which he testified. *Jackowitz* v. *Deslauriers,* 91 R. I. 269, 162 A.2d 528. In *Jackowitz* we observed that a trial court which rejects a witness's positive testimony because it lacks credibility should advert in its decision, even though briefly, to the reasons which lead to the rejection of this type of testimony.

The trial justice, as he passed upon plaintiff's motion for a new trial, not only recognized the rule regarding uncontraverted testimony but also demonstrated an awareness of the exceptions referred to earlier. The Superior Court found that, in the light of the evidence offered at the trial, plaintiff's claim was inherently improbable and then proceeded to point to certain matters in the record which buttressed this conclusion.

The Paquins live in a six-room cottage located at 16 Milton Street in Seekonk. Milton Street runs off Fall River Avenue in a general westerly direction. It is a dead-end street. Mrs. Paquin is a housewife and the mother of two children. The plaintiff said that the Paquins were a two-car family. He used a 1956 Ford to go back and forth to work. Mr. Paquin was employed in a jewelry plant making between $70 and $80 a week. The plaintiff said that he purchased the 1964 blue Corvette convertible—a vehicle which he described as a high-powered sports car—for the use of his wife. He claimed that he paid $3,500 for the

convertible. He said he paid cash for the car. When he was examined under oath prior to the commencement of the suit by defendant pursuant to the policy provisions, he refused to identify the source of this money. At the trial, however, he said this money was a portion of his savings. The plaintiff also declared that, while he had no particular reason for not using the services of a bank, he kept all his savings at home. He stated that he had saved $5,500 in cash during his four years in military service and the six years he spent working in the jewelry shop. During his time in the Army, Paquin attained the rank of corporal. In the spring of 1964, plaintiff purchased his Seekonk home. He paid $2,000 in cash and obtained a mortgage for the balance of the purchase price. He admitted that the purchase of the Corvette wiped out his savings.

The plaintiff testified that he bought the Corvette on the recommendation of his brother-in-law, Raymond Romeo. Romeo appeared as a witness for plaintiff. He described himself as a free-lance automobile mechanic and body man. He performed his auto-body chores in a shop which was adjacent to the automobile agency that sold Paquin the Corvette. The plaintiff's brother-in-law also worked for the used car dealer. He said that the automobile dealer had purchased the fiberglass shell of a Corvette which had been stolen and later recovered together with various parts including an engine which had been salvaged from a Corvette which had been involved in a "roll over."[2] The dealer bought the shell and the parts from an individual who specializes in the purchase and the resale of automobile wrecks which insurance companies have declared a total loss and subject to salvage.

Romeo testified that he took all the parts from the "roll

[2]In the auto body repair business, a "roll over" is a term used to describe an automobile which has overturned as the result of a collision or some other mishap.

over" and assembled them in the shell. When he finished his work, the assembled product was as "good as a brand new car." The plaintiff's relative said that it took him 40 hours to assemble the vehicle which was ultimately sold to plaintiff. This witness stated quite emphatically that the engine he placed in the 1964 Corvette shell came from a "roll over" and not a stolen car.

This engine, as automobile engines go, has lived a rather unusual life. The supervisor of automobile claims at the Providence offices of Travelers Insurance Company testified that their records showed that a 1964 blue Corvette convertible belonging to one of its insureds was stolen in Boston on October 25, 1964. It was recovered on October 29, 1964 with its motor, as well as many other parts, missing. The stolen motor was numbered 40867S122209. This is the same number on the engine installed in Paquin's Corvette by his brother-in-law.

It was also brought out at the Superior Court trial that Paquin subsequently sold the stripped convertible to his brother-in-law for a salvage value of $1,200. The brother-in-law said that he again reassembled a 1964 Corvette convertible only to have it stolen from him and burned about a month later. Although plaintiff promised to produce certain documents which would verify the sale to Romeo, he failed to do so.

Paquin told the court and jury that in the early evening of June 18, 1965 he and his wife used the Corvette to go shopping. On their return, he parked and locked the Corvette on the driveway behind the 1956 Ford. The driveway runs alongside the Paquin home. Around 11 p.m., plaintiff observed the convertible standing on the driveway. He then retired for the evening. There was testimony that shortly after midnight the car was seen in high grass which grows at the dead end of Milton Street—some 300 to 500 feet away from the Paquin residence.

When a suggestion was made by defense counsel that the vehicle parked on the driveway was not the fully equipped car as described by plaintiff, Paquin declared that many neighbors, relatives and friends had observed him as he drove the Corvette through the neighborhood.

The trial justice, as he began to consider plaintiff's motion, recognized that he was bound to make an independent appraisal of all the material evidence in the case and to pass on its weight and the credibility of the witness. Initially, he expressed doubt that plaintiff had actually driven the super deluxe convertible which had been described by him and his brother-in-law. The court pointed out that plaintiff failed to produce witnesses outside of his family circle who would testify that they saw him driving the high powered sports car he had allegedly purchased. The court also thought that plaintiff's source of $3,500 was most unlikely. He commented adversely on plaintiff's initial refusal to disclose the source of this money. The trial justice observed that a man in plaintiff's position, married with two children, earning a rather average salary who takes $2,000 out of $5,500 to buy a house and assumes a mortgage, does not wipe out all his cash reserve by buying a sports car. The court looked askance at Romeo's initial involvement in the sale to plaintiff and the subsequent sale to the brother-in-law. The trial justice also said it was unlikely that the car could be stolen from the driveway and taken up a blind alley to the end of Milton Street. The court thought the time differential was significant as he contrasted the 40 hours it took plaintiff's brother-in-law to assemble the Corvette to the one-hour span between the time plaintiff went to bed and the time one of his neighbors saw the Corvette in the high grass which grows at the end of Milton Street. All of these elements, together with the recitation of plaintiff's saga of the thrice stolen automobile

engine, completely shattered the trial court's belief in the probability of plaintiff's claim.

We believe that the following portion of the trial justice's decision is most illuminating and in light of plaintiff's appeal it bears repeating:

> "There was too much here to stand the light of day. If you take my charge to the jury that they don't have to take what somebody says on the stand as true, but they can assess the probability of its being true against what amounts to the known, found facts, and I have been talking about known, found facts, and when you take this all together, I must say they not only do, I think that a jury could have found as they did; but I would have been a little discouraged in the jury system if they had found otherwise, because I would have had no doubt in my own mind how I would have found, so that in some ways it is the most extraordinary case I have ever heard tried here. I never heard such a series of impeachments of statements which on their face were not directly contradicted. I don't think I have heard as many in my many years here upon the bench and it would stultify my approach to the whole question of jury findings if, having told them that they didn't have to take the spoken words against the facts and the reasonable deductions upon the facts, they couldn't have found as they did."

In our opinion the trial justice has properly performed his duty in passing upon the plaintiff's motion for a new trial. There is no error in his refusal to award the plaintiff a new trial.

The plaintiff's appeal is denied and dismissed and the case is remitted to the Superior Court.

*Gladstone & Zarlenga, Bernard C. Gladstone,* for plaintiff.

*Keenan, Rice, Dolan & Reardon, John F. Dolan,* for defendant.