DECISION
This matter is before the Court on the motion of the plaintiff, Irene L. Kenny, for a new trial. On June 7, 1999, the jury returned a verdict in favor of the defendant responding in the negative to the following questions:
1. Has the plaintiff proven by a fair preponderance of the evidence that the defendant, Barry Wepman, M.D., was negligent, which negligence was a proximate cause of injuries and damages she sustained? and
2. Has the plaintiff proven by a fair preponderance of the evidence that she is entitled to recovery under the doctrine of informed consent?
In her motion, plaintiff claims that the verdict was contrary to the fair preponderance of the evidence and to the law and facts. Plaintiff further contends that the verdict failed to respond to the merits of the case and failed to administer substantial justice between the parties. Plaintiff bases her motion on grounds for which new trials have traditionally been granted. She has not alleged error of law occurring at the trial, which is an additional ground that has become available to moving parties since the 1995 amendment to the Rhode Island Rules of Civil Procedure.[1]
The role of a trial justice when considering such a motion is well settled in this jurisdiction. The trial justice must review the evidence, passing upon its weight and credibility. Carlin v.Parkview Service Co., 212 R.I., 625 A.2d. (1993); Pimental v.D'Allaire, 114 R.I. 153, 330 A.2d 62 (1975). He or she may accept some or all of the evidence and reject testimony because it is impeached or contradicted by other positive testimony or by circumstantial evidence or because it is inherently improbable or at variance with undisputed physical facts or laws. Barbato v.Epstein, 97 R.I. 191, 196 A.2d 836 (1964). The trial justice may add to the evidence by drawing proper inferences. Id. In exercising this role, the judge sits as an extra juror making an independent appraisal of the evidence in light of his or her charge to the jury. Gordon v. Campanella Corp., 112 R.I. 417,311 A.2d 844 (1973). The trial justice need not make an exhaustive analysis of the evidence in deciding a motion for a new trial.Molleur v. City Dairy, Inc., 110 R.I. 58, 290 A.2d 214 (1972). However, he or she must relate, in his or her decision, those portions of the evidence which he or she rejects, those principal witnesses, who, in his or her opinion, are worthy of belief or disbelief, those inferences and conclusions he or she has drawn, and the reasons which influenced his or her decision. Dawson v.Rhode Island Auditorium, Inc., 104 R.I. 116, 242 A.2d 407 (1968).
When considering a motion for a new trial based upon an allegation that the verdict is contrary to the evidence and the weight thereof, the trial justice must determine whether the evidence is evenly balanced or whether it is such that different minds could fairly come to different conclusions. If so, then the verdict should be allowed to stand even if the trial justice entertains some doubt as to its correctness. Bouley v. Gibney,113 R.I. 522, 324 A.2d 318 (1974); Gardiner v. Schobel,521 A.2d 1011 (R.I. 1987). Conclusions of the trial justice on a motion for a new trial should not be substituted for those of the jury, and the jury verdict should not be disturbed merely because the trial justice would have made a contrary finding on the same evidence. Turgeon v. Davis, 120 R.I. 586, 388 A.2d 1172 (1978).
However, if after making an independent review of the evidence the trial justice determines that the verdict is against the fair preponderance of the evidence and failed to do substantial justice, the verdict should be set aside. Beaucheminv. Sweeten, 471 A.2d 624 (R.I. 1984). The motion for a new trial should be granted if, in the judgment of the trial justice, the verdict fails to respond truly to the merits of the controversy and is clearly wrong. Gardiner v. Schobel, supra. Where the jury returns a verdict for the defendant, the plaintiff is only entitled to a new trial where the evidence preponderates against the verdict. Finocchiaro v. Ward Baking Co., 104 R.I. 5,241 A.2d 619 (1968).
Where the motion for a new trial is predicated upon the grounds that the verdict is contrary to law, the only question presented is whether or not the jury accepted and followed the law as given to it by the trial justice in his or her charge.Sneddon v. Costa, 117 R.I. 624, 369 A.2d 643 (1977). On such allegation, the verdict should be set aside if it is contrary to the law given by the trial justice to the jury. Blume v. ShepardCo., 108 R.I. 683, 278 A.2d 848 (1971).
With these well established standards in mind, the Court has reviewed the evidence in the instant matter.
Dr. Wepman was plaintiff's treating ophthalmologist for several years prior to the surgery in question. On August 23, 1995, he performed cataract surgery on her left eye. A complication occurred during that surgery and a portion of the nucleus dislocated into the vitreous. An unsuccessful attempt was made to retrieve the nuclear debris before the initial surgery was completed and the wound closed. Following that surgery and subsequent repair surgery performed by Dr. Glenn Prescod, the plaintiff's retina was torn and she was blinded in her left eye.
Plaintiff's relevant past medical history related to her right eye. Previous surgery included cataract extraction with intraocular lens placement, a glaucoma filtering operation and laser posteriour capsulotomy. All were performed with good results, but the vision in her right eye was impaired.
Plaintiff claims that the defendant was negligent in his decision to perform the surgery, that the surgery was performed in a negligent manner, and that the defendant had failed to obtain the plaintiff's informed consent before operating on her.
The first disputed issue is whether the defendant was negligent in the manner in which he performed the surgery. The defendant and two expert witnesses who testified on his behalf contend that the surgery was performed in a careful and prudent manner, and that the defendant responded appropriately to the complication with which he was confronted. Dr. Joel Kraut, who testified for the plaintiff on this issue, opined that the surgery was performed beneath the standard of care. The witnesses and the jury had the opportunity to view an actual video tape of the surgery.
The basis of Dr. Kraut's opinion was challenged when it was stipulated that he miscalculated the length of the video tape of the surgery. The evidence on the question of whether the defendant was negligent in the manner in which he performed the surgery was, at best, evenly balanced. If the evidence favored either party on this point, it favored the defendant.
Accordingly, the motion for a new trial is denied on the issue of whether the defendant was negligent in the manner in which he performed the surgery.
Before reviewing the evidence as to whether or not the decision to perform the surgery was reasonable, the Court will address the subsequent surgery performed by Dr. Prescod. Dr. Prescod, a retina specialist, operated on plaintiff to remove the nuclear fragments that Dr. Wepman had been unable to retrieve. Dr. Prescod testified that retinal tears occurred as a result of the cataract surgery. The defendant and those experts who testified on his behalf dispute this contention. They maintain that the tears occurred during Dr. Prescod's surgery. Dr. Prescod's operative note and a communication he had with plaintiff's daughter also suggest that the tears may have occurred during the second surgery. However, for purposes of this case, it is irrelevant whether the tears occurred as a result of the first or second operation.
The evidence is undisputed that the second surgery was necessitated by the complications caused by the first surgery, there was no evidence, whatsoever, upon which the jury could have concluded that Dr. Prescod was negligent. No such opinion was offered. Absent evidence that Dr. Prescod was negligent, there was no basis for concluding that an independent intervening act broke the causal connection between the first surgery and the retinal tears, even if they occurred during the second surgery.
The second issue in dispute is whether the defendant was negligent in determining that surgery was appropriate. To prevail on this claim, plaintiff must prove that Dr. Wepman acted beneath the standard of care when he informed her that surgery was a reasonable option. Plaintiff must also prove that she relied on his advice and that she suffered injuries and damages as a result of such reliance. With respect to this claim, the evidence preponderates in favor of the plaintiff. The jury misconceived the evidence in finding for the defendant on this claim.
Dr. Wepman never told plaintiff that cataract surgery was necessary. However, plaintiff testified that after the defendant examined her on June 11, 1995, he told her that she had a cataract in her left eye and that she could have it removed. Prior to that time, she thought her left eye was perfect. Defendant told plaintiff about a new procedure where the cataract is broken up and sucked out. Defendant gave plaintiff his unsolicited opinion that surgery was an option for her to consider. There is no evidence that plaintiff would have considered cataract surgery but for Dr. Wepman's suggestion that the procedure was available to her.
Plaintiff testified that she voiced no complaints concerning the vision in her left eye when she appeared in defendant's office in June and August, 1995. Defendant claims that the left eye cataract was interfering with plaintiff's lifestyle and that plaintiff complained of the following problems: poor vision, glare, difficulty driving, difficulty reading and night blindness. He contends that the left eye cataract was the primary cause of visual disability. (Defendant's Exhibit I).
The credible evidence on the question of whether the cataract interfered with plaintiff's ability to function clearly favors the plaintiff. In drawing this conclusion, the Court relies upon the testimony of the plaintiff, the defendant, the defendant's employees, Ms. Sherburne and Ms. Gagnon, and the pertinent medical records.
Ms. Sherburne testified as to her charting practices. She has worked as a technician for the defendant for eleven years. Karen Gagnon, another technician, also testified. Both Sherburne's and Gagnon's handwriting appear on various records detailing the plaintiff's visits to Dr. Wepman's office. Consistent with their training and practices, they recorded all complaints voiced to them by patients. It is reasonable to infer that had the plaintiff complained to them about experiencing visual problems which interfered with her lifestyle, they would have noted it on the plaintiff's chart.
The only complaint that was recorded on plaintiff's chart on her August 16, 1994 visit and again on her June 11, 1995 visit was that she wanted new eyeglasses. She complained that she pushed her glasses up to read better and that the nose prongs were leaving marks on her nose. (Plaintiff's Exhibit 3). Her corrected left eye vision was 20/40+1, which did not reflect a significant problem.
Defendant contends that plaintiff's complaints about her eyeglasses and the marks on her nose indicated that she had difficulty reading due to the left eye cataract. It is pure speculation to connect these complaints to the cataract. The Court rejects such testimony.
The defendant was not a credible witness on the subject of whether plaintiff had pre-operative complaints concerning the vision in her left eye. Based upon his responses and the manner in which he gave them, the Court rejects his testimony.
On June 11, 1995 and again on August 15, 1995, the plaintiff was examined at the defendant's office. Records were made at the time of those visits. No other complaints were mentioned (Plaintiff's Exhibits 3, 9). The records support the plaintiff's version of the condition of her eyesight and the quality of her lifestyle.
Much attention was devoted to the discrepancies between Exhibit 9, the Pre-Surgical Evaluation form that was prepared contemporaneously with the plaintiff's August 15, 1995 visit and Exhibit I, which is a photocopy of that form with modifications. This form was discovered during trial, and each party accused the other of failing to reveal it sooner.
According to the defendant, it is his custom and practice to take his patient's file home with him on the evening before surgery. At that time, he completes the "Pre-Surgical Evaluation Form" and submits the completed version to the surgical center at the time of surgery. His office file contains a copy of the incomplete form prepared while the patient is in his office.
In this case, the earlier version of the form was undated and failed to note any problems with plaintiff's eyesight. All boxes provided in order to note such problems were left blank.
The form also contained a section entitled "Informed Consent". It included a pre-printed paragraph and a line for the physicians s signature. That paragraph provided in pertinent part:
"As part of the informed consent, the patient . . . has been informed that the indication for cataract surgery . . . is founded on the patient's personal requirement for better vision and that surgery is not necessary solely because a cataract is present." It was signed by the defendant. (Plaintiff's Exhibit 9).
The later version of the Pre-Surgical Evaluation form was purportedly completed on the evening of August 23, 1995. Based upon the evidence presented, the defendant had several surgeries scheduled for August 24, 1995, in addition to plaintiff's surgery. On the evening of August 23, 1995, he completed identical forms for the plaintiff and five other patients. (Defendant's Exhibits D-H, K). With respect to plaintiff, he checked the boxes to indicate that the cataract was interfering with the patient's lifestyle and caused problems, including: poor vision, glare, difficulty driving, difficulty reading and night blindness. He noted that the cataract was the primary cause of the plaintiff's visual disability. (Defendant's Exhibit I).
Defendant testified that he completed plaintiff's Pre-Surgical Evaluation form on the evening of August 23, 1995 and submitted it to the surgical center the next day. Whereas, it may have been reasonable to accept the defendant's explanation as to when and where he completed the document, it was clearly wrong to attribute any weight to the entries contained thereon. Even if defendant completed the form at home on the evening before surgery, the entries were not accurate, and reasonable minds could not have concluded otherwise.
By August 23, 1995, eight days had passed since the defendant had seen the plaintiff. Surely, he could not have recalled all of the details he noted on the form without referring to the plaintiff's chart. However, no corresponding information was contained on her chart. The only recorded complaint referred to her eyeglasses, not to her eyesight. The information he noted on August 23, 1995 was inconsistent with the plaintiff's medical records.
Defendant offers no explanation as to the basis of his references to "glare", "difficulty driving", and "night blindness". He makes no effort to relate these symptoms to her record. The credible evidence and the reasonable inferences the Court draws from that evidence suggests that the defendant merely checked boxes at random to complete the form before submitting it to the surgical center. He wanted the form to appear complete and wanted his reasons for performing the surgery to appear reasonable.
Defendant argues that his signature under the "Informed Consent" paragraph is evidence that plaintiff had a personal requirement for better vision and was not submitting to surgery solely because the cataract was present. The Court disagrees. This section was signed by the defendant, not the plaintiff. It was a self serving statement. If anything, it strengthened plaintiff's case. The fact that the pre-printed form contains such language and includes boxes to check which describe how the cataract interferes with a patient's lifestyle is further evidence that surgery is not indicated absent visual impairment. The fact that defendant completed and signed the form illustrates his own understanding that surgery should not be performed merely because a the patient has a cataract.
The expert testimony was undisputed that the mere presence of a cataract does not justify surgery. It should be removed only if it causes a visual problem, not because it exists. The Court finds no credible evidence of a visual problem.
The testimony of Dr. Kraut was particularly clear and credible on this issue. Dr. Kraut testified that there was no indication that the plaintiff needed cataract surgery. She had no vision complaints. She had no difficulties driving, reading or performing other tasks. Her corrected vision was excellent, 20/40. He concluded that the decision to perform the surgery was beneath the standard of care. The Court agrees.
The jury found that the defendant was not negligent in his decision to perform surgery. This determination was contrary to the evidence and the weight thereof. It failed to respond to the merits of the controversy and was clearly wrong.
Accordingly, the plaintiff's motion for a new trial is granted on the claim that the defendant was negligent in his decision to perform cataract surgery on the plaintiff.
The final issue before the Court is whether the defendant failed to obtain the plaintiff's informed consent before performing the cataract surgery. As the jury was instructed, the doctrine of informed consent imposes a duty on a physician which is completely separate and distinct from his or her responsibility to skillfully treat a patient. Flanagan v.Wesselhoeft, 712 A.2d 365 (R.I. 1998).
A patient's consent to a proposed course of treatment is valid only to the extent that he or she has been informed by the physician as to what is to be done, the risks involved, and the alternatives to the contemplated treatment. Wilkinson v. Vesey,110 R.I. 606, 295 A.2d 676 (1972), Flanagan v. Wesselhoeft,supra. To recover, the plaintiff must prove that the communication to her was unreasonably inadequate and that the risks that the physician failed to disclose were, in fact, material risks. Wilkinson v. Vesey, supra. at 628. The plaintiff must also prove that if she had been informed of the material risks and alternative methods of treatment, she would not have consented to the procedure. Id. at 629.
In this case, the evidence preponderates in favor of the plaintiff on the issue of whether the defendant was negligent in his decision to perform the surgery. In examining the evidence on the claim of lack of informed consent, the Court cannot ignore its determination as to the decision to perform the surgery. The defendant could not have obtained the plaintiff's informed consent without first informing her of the reasons why surgery was indicated. Without that information, plaintiff could not weigh the benefits of the procedure against the risks and the alternative methods of treatment. Where the defendant raised the option of surgery absent evidence of visual problems, plaintiff did not receive crucial information upon which she could give informed consent.
There was testimony that the particular complication suffered by the plaintiff is very rare and that the incidence of blindness resulting from the complication is so rare that there is not statistical data available to quantify the risk. Nonetheless, there is a known risk of blindness from cataract surgery, regardless of the particular complication that causes it.
Both parties agree that the defendant did tell the plaintiff that all surgical procedures were serious and had risks. He spoke in general terms. Defendant testified that he informed plaintiff that there are risks associated with cataract surgery. He stated that he told her that she should be aware of those risks in spite of the fact that she previously had a good experience with cataract surgery on her right eye and in spite of the fact that she may know people who have also had good experiences.
Plaintiff testified that the defendant told her that every operation is a serious one. Although he never told her about the possibility that she might lose her vision, she was aware of that risk. She did not read the consent form before signing it. The defendant never explained alternative methods of treatment. In fact, Dr. Wepman testified that there were no alternatives to the surgery. He rejected changing eye glasses as an alternative.
Dr. Bahr, who appeared as an expert for the defendant, stated that a physician performing cataract surgery is putting a patient's vision at risk if there is a complication. He also stated that where the patient's other eye is compromised, the concern over a complication is greater because it carries with it a larger downside risk. Dr. Bahr explained that the manner in which the surgery is performed is the same regardless of whether the patient has one or two good eyes, but the content of the discussion with the patient is different.
Dr. Bahr stated that the physician should always discuss the potential risk of loss of vision. However, in situations where the non-surgical eye is compromised, the patient needs to understand how a complication during surgery might affect the patient's overall ability to see.
Dr. Wepman failed to have an adequate discussion with plaintiff as to the risks of surgery and as to the alternative methods of treatment. He never discussed her compromised right eye as a fact she should consider before consenting to surgery.
The plaintiff testified that she was aware of the possibility that she could lose her vision as the result of eye surgery. She certainly was aware of her compromised right eye. She never read the consent form in spite of the fact that she was an educated and intelligent woman. She chose surgery so that her good eye would be perfect. She never considered the risks. Even so, it is quite clear that she did rely upon information provided to her as to the reasonableness of considering surgery as an option.
In order to prevail on a claim of lack of informed consent, the plaintiff must prove that she would not have consented to the procedure if the physician had met his obligations to inform her of the risks and alternative methods of treatment. In this case, the plaintiff's conduct cannot be considered in a vacuum: She ignored known risks, failed to read the consent form, and consented to surgery, but she did so on a faulty premise . . . that surgery was a prudent option. It is reasonable to assume that she may have acted differently had she been advised that surgery is not indicated unless the cataract interferes with a patient's lifestyle and causes visual problems. The Court finds that the jury misconceived the evidence and was clearly wrong in determining the question of whether the decision to perform the surgery was negligent. The verdict on the claim of lack of informed consent is tainted by that error.
Accordingly, the motion for a new trial is granted on the claim that the defendant failed to obtain plaintiff's informed consent.
Counsel shall submit the appropriate order for entry.
[1] Super. R. Civ. P. Rule 59, as amended September 5, 1995, provides in pertinent part that a new trial may be granted: "1. In an action in which there has been a trial by jury for error of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of this state."